# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

Richard A. Waite

     v.                                    Case No. 19-cv-259-LM-AJ

Corey Riendeau, Warden,
Northern New Hampshire
Correctional Facility

## REPORT AND RECOMMENDATION

Petitioner Richard A. Waite filed a petition for a writ of habeas corpus in this court under 28 U.S.C. § 2254, challenging his 2015 convictions in the New Hampshire Superior Court on felony and misdemeanor sexual assault and possession of child sexual abuse charges.  Before the Court are Waite's motion for summary judgment (Doc. No. 31) on two claims asserted in his § 2254 petition, and the respondent Warden's motion for summary judgment (Doc. No. 49) on each of Waite's claims.  For the reasons explained herein, the Court recommends that the District Judge deny Waite's summary judgment motion without prejudice, and grant in part and deny in part the Warden's summary judgment motion without prejudice.

## Background[1]

---

[1] The following facts are drawn from the record before, and the decisions of, the state courts involved in Waite's trial, post-conviction litigation, and appeals.  See Cullen v.

I.   <u>Facts Underlying Criminal Charges</u>[2]

On July 24, 2015, following a jury trial, Waite was convicted in the New Hampshire Superior Court, sitting at Cheshire County ("CCSC"), of three counts of aggravated felonious sexual assault ("AFSA"), four counts of attempted AFSA, two counts of misdemeanor sexual assault, and one count of possession of child sexual abuse images.  <u>See</u> <u>State v. Waite</u>, No. 213-2014-CR-00223 (CCSC) ("Criminal Case").  The victims of those offenses were Waite's (then) stepdaughters, M.C. and I.C. The evidence at trial supporting the convictions is as follows.

In 2006, Waite moved in with his then-girlfriend, Tracy Panos, and her two daughters, M.C. (d.o.b. August 7, 1996) and I.C (d.o.b. Aug. 24, 1993).  <u>Crim. Case</u>, Trial Tr. 177.  Shortly thereafter, Waite and Panos bought and, with M.C. and I.C., moved into, a house on Parker Street in Winchester, New Hampshire ("Parker St. House").  <u>Id.</u> at 178.  Waite and Panos got married at the Parker St. House in June 2007, when M.C. was eleven and I.C. was fourteen.  <u>Id.</u> at 178-79.  During the time period relevant to Waite's offenses of conviction, Panos worked

---

<u>Pinholster</u>, 563 U.S. 170, 181 (2011).  Not all of the record facts underlying Waite's convictions are relayed here, only those relevant to the claims addressed in this Report and Recommendation.

[2] Additional facts relevant to specific claims addressed herein are set forth in the discussion of those claims.

outside of the home five to seven days a week, generally leaving the house between 5:45 am. and 6:15 a.m., and arriving home between 3:45 p.m. and 5:00 p.m.. Id. at 172-74. Waite kept bees at the Parker St. House and had a business there selling honey. Id. at 181. He did not work outside the home and was responsible for taking care of M.C. and I.C. while their mother was working. Id. at 174, 181.

I.C. testified at trial that after Waite and Panos got married, Waite "started being very physical," with her, wrestling, and "[r]oughhousing, tackling, yanking," and "just messing around" with her. Id. at 366. At first, I.C. was not bothered because it was "just playing," but then Waite "started grabbing [her] inappropriately," by patting her on the butt and reaching into her shirt and grabbing her "chest." Id. at 366-67. I.C. testified that over time, Waite's conduct grew more inappropriate. Id. at 368.

I.C. testified that when she was fourteen years old, Waite would ask her to watch cartoons with him in his room in the mornings. Id. at 372. She stated that at first, "[h]e would tuck [her] under the blankets with him and then he would spoon [her] and hold [her] and [they] would just watch cartoons until [she] had to go to school." Id. I.C. stated that she went to Waite's room with him in the morning five or six times, but that each day Waite's conduct would escalate, making her more and

more uncomfortable.  Id. at 372-73.  After that, I.C. refused to go with Waite to his room anymore.  Id. at 373.  I.C. stated that after she stopped going into Waite's room to lie down with him, she would see M.C. with Waite, in his bed in the mornings, "tucked under the covers with him."  Id. at 376.

I.C. also testified that on one occasion, she bumped into Waite when she was coming around a corner in the house, and Waite grabbed her.  Id. at 369.  I.C. stated that after Waite grabbed her, she "was trying to get away," and Waite pushed her "up against the pantry," then "tried to put his hand down [her] pants."  Id.  I.C. stopped Waite and pushed him off of her because she "didn't like it" and it made her "extremely uncomfortable."  Id.

M.C. testified that when she first met Waite, they got along, but that their relationship changed after Waite married her mother, and then he "wasn't as nice."  Id. at 471.  M.C. stated that when she was eleven years old, Waite would wake her up in the morning after Panos left for work, and she and Waite would watch cartoons together in Waite's bed until she had to get ready for school.  Id. at 475-76.  M.C. stated that on those occasions, Waite started "inappropriately touching" and caressing her, including her "chest," over and under her clothing, most days of the week.  Id. at 477-78.

M.C. testified that when she was eleven or twelve years old, while she was in Waite's bed in the mornings, he started also touching the inside and outside of her vagina with his hand.  Id. at 479-80.  M.C. further stated that when she was twelve, Waite started to have her masturbate him with her hand at least five times a week, and that this occurred through the beginning of her tenth-grade year.  Id. at 482, 488-89.

M.C. testified that on two occasions, Waite tried to use a vibrator on her by turning it on and pushing it up against her vagina.  Id. at 500.  M.C. further testified that when she was fourteen, Waite tried to have sex with her "a couple times" by getting on top of her and rubbing his penis on the outside of her vagina.  Id. at 489-92.  M.C. said that on those occasions, she got upset and started to cry, and that Waite stopped when she cried.  Id. at 493.

In 2011, the Parker St. House was foreclosed on, and Waite, Panos, and M.C. rented rooms in the parsonage of their church which were available to "people who were in difficult situations."  Id. at 756.  I.C. turned eighteen shortly before Waite and Panos lost the Parker St. House and moved out of that house to live with her boyfriend's family for her senior year of high school.  Id. at 208.  Waite's mother, Donna Vollert, who had been living at the Parker St. House, purchased and moved to

5

a house in Hinsdale, New Hampshire ("Hinsdale House").  Id. at
194.

After approximately six months at the parsonage, Waite,
Panos, and M.C. moved in with friends in Jaffrey.  Id. at 210,
214-15.  In the summer of 2012, after living in Jaffrey for a
short time, Waite moved into the Hinsdale House with his mother.
Id. at 220-21.  Panos and M.C. remained in Jaffrey.  Id.
However, M.C. did not want to go to the high school in Jaffrey.
Id. at 210.  M.C. wanted to return to Keene High School because
she was involved in the music program there and her friends were
there.  Id.  In order to continue to attend Keene High School,
M.C. started to spend several nights a week at the Hinsdale
House with Vollert and Waite.  Id. at 201-11.  The only bed
available to M.C. at the Hinsdale House was the top bunk of
Waite's bunkbed in his bedroom.  Id. at 562-63.

M.C. testified that in the fall of 2012, when she was
sixteen, she made a sexually explicit video with her then-
girlfriend, R.L., who was fifteen at the time.  Id. at 549.  A
couple of weeks after they made the video, M.C. and R.L. broke
up.  Id. at 551.  M.C. testified that she was concerned that
R.L. was "going to do something with" the video, because they
had a bad breakup, and R.L. was angry at M.C.  Id. at 552, 555.
M.C. said that Waite "saw that [she] was upset and made [her]
tell him why," and became angry when she did not give him a

reason, so she told him about the video.  Id. at 552, 554.  M.C.
then testified as follows:

> And then he told me that I needed to get a copy of it
> so that he could have it and put it on his computer
> and make sure that no one else could make a copy of it
> because he had something that he used that could make
> sure that no one else can copy it and he would be able
> to see it if it was online.

Id. at 552.

M.C. agreed to get Waite a copy of the video.  Id. at 554.
When M.C. arrived, R.L. was in the process of downloading the
video to a CD, which she gave to M.C.  Id. at 557.  M.C.
testified that she did not watch the CD and therefore did not
have personal knowledge that the video was actually on the disc.
Id. at 558-59.  M.C. gave Waite the CD when they returned to the
Hinsdale House.  Id. at 561.  M.C. testified Waite then put the
CD into his computer, and that "[a]fter he was done with that on
his computer, he took it out and showed [her] it and he broke it
in half," and that "[h]e told [her] that he did something so
that he could track it, but he didn't watch it and it wasn't
downloaded on his computer."  Id. at 563.

Panos testified that after Waite moved to the Hinsdale
House in 2012, Panos tried to see him there on the weekends, and
that M.C. sometimes went with her.  Id. at 275-76.  Panos also
testified that just before Thanksgiving, she removed M.C. from
Keene High School because M.C. was failing her classes, and

instead had M.C. attend Conant High School in Jaffrey.  Id. at

212.  Panos testified that the following month, she and Waite

had a fight while Panos was visiting him in Hinsdale, and she

and M.C. left the Hinsdale House, and did not see Waite again

outside of a courthouse.  Id. at 278.  Panos filed for a legal

separation in early 2013, and their divorce became final in the

summer of 2015, before the July 2015 trial in this matter.  Id.

at 221.


II.  State Court Criminal and Post-Conviction Proceedings[3]

In November 2014, a Cheshire County grand jury charged

Waite by indictment with four counts of AFSA, five counts of

attempted AFSA, and one count of possession of child sexual

abuse images; the State also charged Waite by Information with

fifteen counts of misdemeanor sexual assault.[4]  See Crim. Case,

Nov. 24, 2014 Indictments (Index No. 7); Nov. 24, 2014

Informations (Index No. 8).  All the charges involved M.C. or

---

[3] The procedural history of this matter is provided to place
the claims addressed in this Report and Recommendation in
context.  Accordingly, the Court relates only the events
relevant to the issues addressed herein.

[4] Waite was initially indicted on an additional fourteen
counts of possession of child sexual abuse images.  Those
charges were severed from the charges tried in the Criminal
Case.  See State v. Waite, No. 213-2014-CR-0063 (CCSC) (Doc. No.
61-1, at 32).  The State nolle prossed the severed charges after
Waite's conviction in the Criminal Case.

I.C.  Id.  Counsel was appointed to represent Waite in the
Criminal Case.  See id. (Index No. 19).

Waite's jury trial began July 20, 2015.[5]  At the close of
the State's case, the trial court granted a defense motion to
dismiss the three Informations charging Waite with misdemeanor
sexual assault on M.C., and denied the defense's motions to
dismiss the Indictments charging Waite with possession of child
sexual abuse images and attempted AFSA on I.C., and the twelve
Informations charging Waite with misdemeanor sexual assaults on
I.C.  Id., Trial Tr. at 745-50.

On July 24, 2015, the jury returned a verdict of guilty on
three counts of AFSA on M.C., three counts of attempted AFSA on
M.C., one count of possession of child sexual abuse images, one
count of attempted AFSA on I.C., and two counts of misdemeanor
sexual assault on I.C.  Id. at 1—5-14.  The jury acquitted Waite
of one count of attempted AFSA on M.C. and ten counts of
misdemeanor sexual assault on I.C.  On April 1, 2016, the CCSC
sentenced Waite to serve an aggregated prison term of forty-five
years to life, and suspended additional consecutive prison
sentences.  See Crim. Case, Notice of Mandatory Appeal (Index

---

[5] On July 16, 2015, prior to trial in the Criminal Case, the
State nolle prossed one of the AFSA indictments.  See id. (Index
No. 74).

No. 123) (Doc. No. 43-1, at 12-14, 16-17, 19-21, 23-25, 27-28, 30-31, 33-35, 37-39, 41-43).

On April 29, 2016, through counsel, Waite filed a direct appeal in the New Hampshire Supreme Court ("NHSC").  See id.; see also State v. Waite, No. 2016-0233 (NHSC) ("Direct Appeal"). The NHSC affirmed Waite's conviction.  See Direct Appeal, 2018 N.H. LEXIS 35, at *9, 2018 WL 1190684, at *4 (N.H. Mar. 8, 2018).

On September 16 2016, while his Direct Appeal was pending, Waite filed a pro se motion for a new trial in the CCSC.  Crim. Case (Index No. 128) (Doc. No. 50, at 12).  The CCSC summarily denied the motion on October 25, 2016, apparently because the State was not properly served with Waite's motion.  Waite moved to reconsider the denial of that motion on December 5, 2016. Id. (Index No. 132).  The motion to reconsider was summarily denied on December 7, 2016.  On December 19, 2016, Waite filed a document entitled "Motion for Answer to State's Reply," which the CCSC treated as a motion for reconsideration.  Id. (Index No. 139) (Doc. No. 50, at 10).  The CCSC granted the motion in part and denied it in part, as follows:

> The Defendant's Motion to Answer State's Reply is
> Granted in part.  The Court has reviewed the materials
> provided by the defendant and finds that the "service
> of process" issues are now moot.  The defendant's
> pleading does not persuade the Court that it should
> reconsider any of its prior rulings.  Therefore, the

> request to allow the untimely pleading is granted, but
> the underlying request for relief is Denied.

Dec. 27, 2016 Order, id. (Index No. 140) (emphasis in original)
(Doc. No. 50, at 11).

On December 30, 2016, Waite filed a Notice of Discretionary
Appeal ("NODA") in the NHSC. See id. (Index No. 142) (Doc. No.
50, at 2). The NHSC declined that appeal. See State v. Waite,
No. 2016-0685 (NHSC).

In the meantime, on January 9, 2017, Waite filed another
motion to reconsider the denial of his motion for a new trial in
the CCSC. Crim. Case (Index No. 144). The CCSC denied that
motion on May 1, 2017.

On March 25, 2019, Waite filed a second motion for new
trial in the CCSC. Id. (Index No. 154). The State moved to
treat that motion as a petition for a writ of habeas corpus.
Id. (Index Nos. 162, 166). The CCSC granted the State's motion
on May 22, 2019. On December 14, 2020, the CCSC granted the
State's motion to dismiss Waite's (recharacterized) petition for
a writ of habeas corpus. Id. (Index No. 261) (Doc. No. 46-1, at
6). On January 14, 2021, Waite filed a motion to reconsider the
CCSC's December 14, 2020 Order. Id. (Index No. 262). The CCSC
denied the motion to reconsider on January 20, 2021.

Waite appealed the dismissal of his habeas action to the
NHSC. See Feb. 3, 2021 NODA, id. (Index No. 263) (Doc. No. 46-

1).  The NHSC declined the appeal on March 18, 2021.  See State
v. Waite, No. 2021-0039 (N.H. Mar. 18, 2021) (Doc. No. 46-2).

Although the record before this Court is incomplete, it
appears that, at some point during the pendency of his State
habeas proceedings, Waite filed a second petition for a writ of
habeas corpus in the State court.  See Waite v. N. N.H. Corr.
Facility, No. 213-2020-CV-00191 (CCSC).  The CCSC dismissed that
petition on March 10, 2021.  Doc. No. 75-1, at 29.  Waite filed
a NODA in the NHSC appealing that dismissal on March 27, 2021.
The NHSC declined the appeal on May 28, 2021.  See Waite v. N.
N.H. Corr. Facility, No. 2021-0132 (NHSC) (Doc. No. 55-2).


III. Federal Habeas Proceedings

Waite filed his initial petition (Doc. No. 1) in this Court
in March 2019.  Along with his petition, Waite filed a motion to
stay this case (Doc. No. 2), stating that he was still in the
process of exhausting claims in the state courts which he wished
to assert in this action.  The Court stayed this matter pending
Waite's exhaustion of his claims in state court.  Once his state
court exhaustion proceedings were over, Waite filed an amended
petition (Doc. No. 18), and an addendum (Doc. No. 19) to the
amended petition.  The Court issued an Order (Doc. No. 20)
directing the respondent to answer or otherwise respond to the
claims identified in that Order.

In the Order directing an answer, the court identified: Claims 1(a)-(i), asserting Sixth Amendment violations based on the ineffective assistance of trial counsel; Claim 2, asserting a Sixth Amendment violation based on the ineffective assistance of appellate counsel; Claim 3, asserting Fourteenth Amendment due process and equal protection claims based on the state court's denial of a transcript for use in litigating his post-conviction proceedings; Claims 4(a) and 5(b), asserting Fourteenth Amendment due process violations alleging that the trial evidence was insufficient to support certain of his convictions; Claim 4(b), asserting a Fourteenth Amendment due process violation arising from the State's alleged failure to comply with Brady v. Maryland, 373 U.S. 83 (1963) in the Criminal Case; Claim 5(a), asserting a Fourteenth Amendment due process violation concerning the trial court's limitation of the scope of certain testimony at trial; and Claim 6, asserting a Fourteenth Amendment due process violation for alleged prosecutorial misconduct.  Waite then filed another addendum (Doc. No. 21) to his amended petition, asserting additional claims he seeks to raise in this action.  Waite has claimed that each of his claims has been exhausted in the state courts.

The Court directed the respondent to answer the above-listed claims.  The respondent filed an answer (Doc. No. 23) and other documents responsive to the Court's Order to answer the

petition.  See Doc. Nos. 26, 42-44, 46, 50, 51, 55, 61, 67-69, 73, 75.

Waite then filed his instant motion for summary judgment (Doc. No. 31), seeking judgment on the claims identified by the Court as Claim 1(a) and Claim 6.  Respondent filed an objection (Doc. No. 36) to Waite's motion for summary judgment.  Respondent also filed a motion for summary judgment (Doc. No. 49), and Waite filed an objection (Doc. No. 58) to the respondent's motion.

## **Discussion**

I.    Summary Judgment Standard in § 2254 Cases

A person incarcerated[6] pursuant to a state court conviction and sentence may challenge that conviction and/or sentence by filing a petition for a writ of habeas corpus alleging "that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Only claims asserting a violation of the petitioner's federal rights are cognizable in a § 2254 action, as "federal habeas corpus

---

[6] Under 28 U.S.C. § 2241(c) and § 2254(a), this Court has "jurisdiction to entertain petitions for habeas relief only from persons who are 'in custody in violation of the Constitution or laws or treaties of the United States.'"  Maleng v. Cook, 490 U.S. 488, 490 (1989) (quoting 28 U.S.C. § 2241(c)(3)) (emphasis in original).  Neither party disputes that Waite is in custody pursuant to the convictions he is challenging here.

relief does not lie for errors of state law." Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (internal quotation marks and citations omitted). "[H]abeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citation and internal quotation marks omitted).

> Summary judgment is warranted if the record, construed in the light most flattering to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law. At the same time, the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which governs petitions for writs of habeas corpus, sets out a separate and exacting standard applicable to review of a state court's factual findings. The state court's factual findings are presumed to be correct unless the petitioner rebuts that presumption of correctness with clear and convincing evidence.

Watson v. Edmark, 118 F.4th 456, 459-60 (1st Cir. 2024) (internal quotation marks, citations, and footnote omitted); see also 28 U.S.C. § 2254(e)(1)).

The "same standard applies when, as here, the parties file cross-motions for summary judgment." MRFranchise, Inc. v. Stratford Ins. Co., No. 22-cv-572-LM, 2024 U.S. Dist. LEXIS 213500, at *2, 2024 WL 4651195, at *1 (D.N.H. Nov. 1, 2024) (citing Dixon-Tribou v. McDonough, 86 F.4th 453, 458 (1st Cir. 2023)). "In other words, the court reviews each motion

separately and draws all reasonable inferences in favor of each respective nonmoving party." MRFranchise, Inc., 2024 U.S. Dist. LEXIS 213500, at *2, 2024 WL 4651195, at *1 (citing Motorists Com. Mut. Ins. Co. v. Hartwell, 53 F.4th 730, 734 (1st Cir. 2022)).  The court construes this petitioner's pleadings liberally, as he is representing himself in this manner.  See Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir. 2008).

The standard the Court applies in considering whether to grant relief on a federal claim in a § 2254 petition depends on whether the state courts: adjudicated the merits of the federal claim (or are presumed to have done so), provided reasons for their decisions, denied relief on the basis of a state procedural rule, or altogether failed to rule on a federal claim presented to them.  See Wilson v. Sellers, 584 U.S. 122, 125–26 (2018); Davila v. Davis, 582 U.S. 521, 527-28 (2017); Quintanilla v. Marchilli, 86 F.4th 1, 16 (1st Cir. 2023); Hodge v. Mendonsa, 739 F.3d 34, 41 (1st Cir. 2013).

To be eligible for relief under § 2254, the petitioner must show that he exhausted the remedies available in the state courts for each of his federal claims, or that state court remedies are unavailable or ineffective to protect his rights. See 28 U.S.C. § 2254(b)(1); see also Rose v. Lundy, 455 U.S. 509, 510 (1982).  In New Hampshire, a petitioner's state court remedies are exhausted when the NHSC has had an opportunity to

rule on the claims.  See Lanigan v. Maloney, 853 F.2d 40, 42 (1st Cir. 1988).

However, where a federal claim before this Court is either unexhausted, procedurally defaulted, or the court cannot determine whether a claim is exhausted or procedurally defaulted on the state court record available, the court may, under certain circumstances, review such a claim on the merits.  See Davis v. N.H. State Prison Warden, Civil No. 18-cv-1246-SE-AJ, 2024 U.S. Dist. LEXIS 59628, at *14, 2024 WL 1363749, at *6 (D.N.H. Feb. 27, 2024), R&R approved, 2024 U.S. Dist. LEXIS 57246, at *1, 2024 WL 1348816, at *1 (D.N.H. Mar. 29, 2024). "When, as here, the petitioner's claims do not survive summary judgment under the petitioner-friendly de novo standard of review, there is no need to consider other grounds to dismiss the claims."  Id. (citing Bourdon v. Warden, No. 19-cv-258-SE, 2022 U.S. Dist. LEXIS 142139, at *3, 2022 WL 3228786, at *2 (D.N.H. Aug. 10, 2022) ("[T]he court will forego analyzing whether each of [petitioner]'s claims was procedurally defaulted, exhausted, raised but not addressed, or adjudicated on the merits in state court.  Instead, the court will assume for purposes of this order that the de novo standard of review applies to each of [petitioner]'s claims."), certificate of appealability denied sub nom., Bourdon v. Riendeau, No. 22-1661,

2023 U.S. App. LEXIS 23399, at *1, 2023 WL 5601341, at *1 (1st
Cir. Aug. 8, 2023)).

II.   Claims 1(a)-(i), 2, 3, and 6

The Court has reviewed all of the petition documents and
the attachments thereto, the answer, and the transcripts and
other portions of the State court record filed by the
respondent, and the parties' summary judgment filings.  After
reviewing those documents, which together consist of hundreds of
pages (excluding the lengthy state court transcripts), it is
clear to the Court that Waite intended to bring, and has likely
exhausted, a number of specific claims of ineffective assistance
of counsel and prosecutorial misconduct which the court has not
previously identified, and to which, therefore, the respondent
has not been provided the opportunity to respond.

In addition, while Waite asserts that all of the documents
he has submitted in this case are relevant to his arguments on
the claims in his petition, the Court is unable to determine
which of those documents actually appear in the state court
record relevant to this matter, and are thus available for the
Court's consideration.[7]  Additionally, the Court notes that a

_____

[7] In general, a federal habeas court "review under §
2254(d)(1) is limited to the record that was before the state
court that adjudicated the claim on the merits."  Cullen, 563
U.S. at 170.

18

number of documents in the State court record, which appear to
be relevant to Waite's ineffective assistance of counsel and
prosecutorial misconduct claims, have not yet been provided to
the Court.  Similarly, there are state court hearings for which
this Court has not been provided a transcript, which also appear
to be relevant to those claims.

    For these reasons, the Court finds that the most
efficacious way to proceed on Waite's claims asserting
ineffective assistance of counsel, the denial of a transcript
necessary to litigate his ineffective assistance of counsel
claims, and prosecutorial misconduct, which are set forth in the
claims the court has identified as Claims 1(a)-(i), 2, 3, and 6,
is to complete a secondary review of the petition documents,
including petition addenda filed after the court ordered the
respondent to answer the petition, similar to the review the
court previously conducted under Rule 4 of the Rules Governing §
2254 Proceedings.  The undersigned Magistrate Judge therefore
recommends that the District Judge deny Waite's motion for
summary judgment (Doc. No. 31), which concerns only Claims 1(a)
and 6, and deny the respondent's motion for summary judgment
(Doc. No. 49) to the extent it seeks judgment in his favor on
Claims 1(a)-(i), 2, 3, and 6, without prejudice to the parties'
ability to seek summary judgment on those claims at a later
stage of the proceedings, once all of the claims in this case

have been properly identified and the record before this Court is complete.  Once the District Judge rules on this Report and Recommendation, the undersigned Magistrate Judge will issue an Order advising the parties as to how the Court intends to proceed, and what actions, if any, the parties must take at that time.

III. Claims 4(a)-(b) and 5(a)-(b)

The remaining claims in this case are, as the court has previously identified them:

4. Mr. Waite's conviction violated his Fourteenth Amendment right to due process in that:

a. evidence used by the state in support of his conviction, namely, a video created by the victim, was not credible; and

b. related exculpatory evidence was lost or not turned over to Mr. Waite, pursuant to Brady v. Maryland, 373 U.S. 83 (1963), namely, a police report or materials related to a police report in which a victim "did not disclose felony level charges."

5. Mr. Waite's conviction violated his Fourteenth Amendment right to due process where the trial court:

a. limited the scope of testimony of a defense witness, namely, "Ms. Vollert"; and

b. failed to dismiss the charges against him based on insufficiency of the evidence.

Doc. No. 20, at 4-5.

In the respondent's motion for summary judgment, among other arguments, he contends that the above-listed claims are

subject to dismissal because they were not exhausted in the
state courts, and/or that they fail on their merits.  For the
reasons explained below, the Court finds that Claims 4(a)-(b)
and 5(a)-(b) fail on their merits under the petitioner-friendly
de novo standard of review.  Accordingly, the Court need not
consider whether there are other grounds to dismiss the claims.
See Davis, 2024 U.S. Dist. LEXIS 59628, at *14, 2024 WL 1363749,
at *6; Bourdon, 2022 U.S. Dist. LEXIS 142139, at *3, 2022 WL
3228786, at *2.


      A.    Sufficiency of the Evidence Claims

In Claims 4(a) and 5(b), Waite challenges the trial court's
failure to dismiss certain claims against him at the close of
the State's case for insufficiency of the evidence, in violation
of his Fourteenth Amendment right to due process.  At the close
of the State's case, defense counsel moved to dismiss certain
charges against Waite based on insufficient evidence.  The trial
court granted defense counsel's motion to dismiss the three
Informations charging Waite with misdemeanor sexual assault on
M.C. when M.C. was under sixteen years old, as M.C. testified
that she was sixteen years old at the time the events underlying
those charges occurred.  Crim. Case, Trial Tr. 745.  Defense
counsel also sought dismissal of the possession of child sexual
abuse charge, the twelve misdemeanor sexual assault charges

concerning I.C., and the attempted AFSA on I.C.  The trial
court, finding that the evidence at trial was sufficient to
allow those charges to go to the jury, denied the defense
motions as to those offenses.

### 1.    Legal Standard for Sufficiency of the Evidence

In Musacchio v. United States, the Supreme Court iterated
the following standard for courts to apply in evaluating a
sufficiency-of-the-evidence claim:

> Sufficiency review essentially addresses whether "the
> government's case was so lacking that it should not
> have even been submitted to the jury."  On sufficiency
> review, a reviewing court makes a limited inquiry
> tailored to ensure that a defendant receives the
> minimum that due process requires: a "meaningful
> opportunity to defend" against the charge against him
> and a jury finding of guilt "beyond a reasonable
> doubt."  The reviewing court considers only the
> "legal" question "whether, after viewing the evidence
> in the light most favorable to the prosecution, any
> rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt."
> That limited review does not intrude on the jury's
> role "to resolve conflicts in the testimony, to weigh
> the evidence, and to draw reasonable inferences from
> basic facts to ultimate facts."

577 U.S. 237, 243 (2016) (internal citations omitted) (emphasis
in original).  A sufficiency challenge will fail where "a jury
could rationally find the evidence to have been sufficient to
prove the defendant guilty beyond a reasonable doubt, even

though a rational jury could also have drawn a reasonable inference from the evidence that would have resulted in an acquittal." United States v. Rivera-Ruperto, 884 F.3d 25, 40 n.21 (1st Cir. 2018) (citing Musacchio, 577 U.S. at 244).

> 2.    Possession of Child Sexual Abuse Images (Claim 4(a))

Waite was convicted on one count of possession of child sexual abuse images, in violation of RSA 649-A:3.  The indictment charged as follows:

> Richard Waite of Hinsdale, Hew Hampshire, did commit the crime of Possession of Child Sex Abuse Images contrary to RSA 649-A:3, a Class A felony on or between January 1, 2012, and September 5, 2014, in Hinsdale, New Hampshire, in that: Richard Waite knowingly possessed or controlled a visual representation of a child engaging in sexually explicit conduct; to wit, Waite saved a copy of a computer file with a video of a child – M.C. (date of birth 8-7-96) who was a child at the time the visual representation was created – engaging in sexually explicit conduct, and Waite kept the video in the house at 12 Church Street where he lived with his mother.

Indictment No. 1012653C, Crim. Case (Doc. No. 43-1, at 32) (capitalization amended).

As the trial court instructed the jury in Waite's case, the elements of the offense of possession of child sexual abuse images are: "1) The Defendant possessed or controlled the visual representation of M.C. engaging in sexually explicit conduct; 2) M.C. was under the age of 18 at the time the visual

representation was created; and 3) The Defendant acted knowingly." Id., Trial Tr. 979-80.  The trial court defined certain terms in that instruction as follows:

> Sexually explicit conduct means human masturbation, the touching of the actor's or the -- or other person's sexual organs in the context of the sexual relationship. Sexual intercourse actual or simulated, normal or perverted, whether alone or between members of the same or opposite sex or any lewd exhibitions of the buttocks, genitals, flagellation, bondage or torture.
>
> Visual representation means any visual depiction including a photograph, film, video, digital image or picture.
>
> Knowingly means the State must prove that the Defendant was aware of the nature of his conduct or the circumstances under which he acted. The State does not have to prove that the Defendant specifically intended or desired a particular result. What the State must prove is that the Defendant was aware that his conduct would cause a certain result.

Id. at 979-80.

At the close of the State's case, defense counsel moved to dismiss the possession of child sexual abuse images indictment on the grounds that the evidence presented by the State at trial was insufficient to support a conviction on that charge.  Id. at 747-49.  The trial court denied the motion.  Id.

The child sexual abuse images Waite was charged with possessing consisted of the video that M.C. and R.L. made of themselves engaging in sexual acts, in R.L.'s bedroom, when they were dating in November 2012, when M.C. was sixteen and R.L. was

fifteen.  Waite does not contest the sufficiency of the evidence of the second element of the offense, that M.C. was under the age of eighteen at the time the video was made.

Waite argues instead that the evidence at trial was insufficient to support his conviction for possessing the video because the video itself was never in evidence, and in fact, the video was never located by any law enforcement officer or prosecutor, although the Hinsdale Police Department ("HPD") had possession of Waite's computer and data storage devices, and HPD Chief Todd Faulkner examined those devices.  Waite's argument appears to be, therefore, that no creditable evidence at trial proved that the video was ever in his possession, or that, if it was in his possession, that his possession was knowing.

The following evidence was elicited at trial:

R.L. testified that she and M.C. dated for approximately two months in the fall of 2012.  Id. at 436.  She stated that she and M.C. made a sexually explicit video in October 2012, while they were dating.  Id. at 439.  R.L. described the sexually explicit acts on the video as "[R.L.'s] body in contact with [M.C.'s] body," specifically, "fingers and breasts and vaginal area stuff," including digital/genital contact and oral/genital contact.  Id. at 441-42.  R.L. stated that she and M.C. Watched the video once after they made it.  Id. at 440.

R.L. further testified that after she and M.C. broke up, Waite contacted R.L. through Facebook and tried to get R.L. to give him a copy of the video "in a rather coercive manner." Id. at 437. R.L. testified that, via Facebook, Waite told her that he had "military-grade software" with which "he could check every computer in the world . . . and make sure that the file wasn't shared anywhere else." Id. at 449. R.L. testified that she understood Waite's Facebook communications with her to be threatening. Id. R.L. stated that Waite also threatened to report to the police that R.L. was sexually involved with a thirty-two year old man R.L. knew, who she did not want to see in trouble for what R.L. characterized as a false accusation that he was having sex with a fifteen-year-old. Id.

After discussing it with M.C., R.L., in response to Waite's threats, agreed to give him a copy of the video. Id. at 449-53. She stated that she copied the video file from her laptop to a CD, then deleted it from her laptop in front of M.C. Id. at 451-52. R.L. further stated that she had intended to provide Waite with a blank CD, but discovered after giving the CD to M.C. that the discs had been mixed up, and that she still had the blank CD and had given M.C. the CD with the sexually explicit video to give to Waite. Id. at 454.

M.C. testified that she collected the CD from R.L., gave it to Waite, and that later that day, at the Hinsdale House, Waite

26

inserted the CD into his computer in her presence.  Id. at 562.
M.C. further testified that "[a]fter [Waite] was done with that
on his computer, he took [the CD] out and showed it to [her] and
broke it in half."  Id. at 562-63.  M.C. stated that Waite then
"told [her] that he did something so that he could track it, but
he didn't watch it and it wasn't downloaded on his computer."
Id. at 563.

Keene Police Department Detective Jennifer Ramey testified
at trial that on October 9, 2014, she met with Waite, at his
request, because he had "information he wanted to provide the
police."  Id. at 408.  Det. Ramey testified that during that
meeting, Waite told her that when M.C. was sixteen years old,
M.C. and R.L. made a sexually explicit video, and that M.C. had
asked Waite to get rid of it.  Id. at 409.  She further
testified that Waite said he went with M.C. to get the video
from R.L., and that "[M.C.] had downloaded it to [Waite's]
computer."  Id. at 410.

Det. Ramey stated that Waite told her that he never watched
the video.  He also told her that there might be a copy of the
video on a flash drive the HPD seized from Waite's bedroom
during a search of the Hinsdale House.  Id. at 409-10.  Det.
Ramey stated that Waite told her he did not destroy the video
because he was going through a divorce from M.C.'s mother and
"was told that he could not destroy" it.  Id. at 410.

Chief Faulkner served as the forensic examiner of the computers and data storage devices the police seized from Waite's home during the investigation of the charges against Waite.  In his trial testimony, Chief Faulkner stated that he looked for the video of M.C. and R.L. on Waite's computer and data storage devices, but did not find it.  Id. at 124.  Chief Faulkner states that he spent several days trying to find the video on those devices using "several forensic tools," but that he "just touched the surface" of the content of those devices. Id. at 124, 126-27.  The video was not produced at trial.

As explained above, this Court considers the evidence at trial to determine whether, viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of possession of child sexual abuse images beyond a reasonable doubt.  See Musacchio, 577 U.S. at 243.  Applying that standard, the Court finds that a rational trier of fact could have found, based on the evidence presented at trial, that M.C. and R.L. created a sexually explicit video when they were both under the age of eighteen, that, at Waite's request, R.L. copied the video onto a CD which she gave to M.C., who in turn gave the CD to Waite, and that Waite then downloaded the video from the CD to his computer. There was sufficient evidence, therefore, to allow the jury to find that Waite possessed the video, that the video depicted

sexually explicit conduct by people under the age of eighteen, and that Waite knew he possessed it.

Evidence that Det. Faulkner did not find the video does not render it unreasonable for the jury to find possession, as Faulkner testified that he did not examine all of the contents of Waite's computers and data storage devices. Further, although M.C. testified that Waite told her he did not download a copy of the disc to his computer, that evidence was contradicted by Det. Ramey's testimony that Waite admitted to her that a copy of the video might exist on one of the flash drives in the HPD's possession. From that testimony, a reasonable juror could infer that the video had been downloaded from the CD to Waite's laptop, and that Waite then transferred the video from his laptop to a flash drive, indicating that he knew he possessed the sexually explicit video of M.C. and R.L.

Further, to the extent Waite asserts that because the video itself was never found, there was no credible evidence produced at trial which could reasonably form the basis for a conviction, his argument is unavailing. "Assessing the credibility of the witnesses [is] the role of the jury." United States v. Martínez-Hernández, 118 F.4th 72, 83 (1st Cir 2024). See also State v. Argie, Case No. 2022-0008, 2025 N.H. LEXIS 22, at *7, 2025 WL 453899, at *3 (N.H. Feb. 11, 2025) ("it is for the jury to ultimately determine credibility and to decide what weight

should be given to the evidence"); cf. also United States v. Correia, 55 F.4th 12, 41 (1st Cir. 2022) ("we afford appreciable deference to jury determinations of witness credibility").

The Court finds that the evidence at trial, viewed in the light most favorable to the State, was sufficient to allow a rational trier of fact to find "'the essential elements of the crime beyond a reasonable doubt.'" Musacchio, 577 U.S. at 243 (citation omitted). Accordingly, the evidence at trial was sufficient to support Waite's conviction for possession of child sexual abuse images, and the District Judge should grant the respondent's motion for summary judgment as to Claim 4(a).

### 3. Misdemeanor Sexual Assaults on I.C.

Waite was charged by Information with twelve misdemeanor sexual assaults on I.C., in violation of RSA 632-A:4, I(b). Six of those charges alleged that:

> Richard Waite purposely subjected a child (I.C., DoB 8-24-93) who was 13 years of age and under 16, and not his legal spouse, to sexual contact, where the age difference between WAITE and I.C. was five years or more; to wit, Waite intentionally touched, whether directly, through clothing, or otherwise, the breasts of I.C. for the purpose of WAITE's sexual arousal or gratification.

Crim. Case, Information No. 1013504C (Doc. No. 43-1, at 40). The other six Informations were the same, except that they said "buttocks" instead of "breasts." See, e.g., id., Information

No. 1013510C (Doc. No. 43-1, at 44).  The jury ultimately found Waite guilty of two charges of misdemeanor sexual assault on I.C. – one for touching her breasts, and one for touching her buttocks.

As the trial court instructed the jury, the elements of the offense of misdemeanor sexual assault, as charged in the Informations concerning I.C., are: "(1) the Defendant engaged in sexual contact with" I.C.; that "(2) I.C. was over 13 and under 16 years of age at the time,"; that "(3) I.C. was not the Defendant's legal spouse"; that "(4) [t]he Defendant intentionally touched, whether directly through clothing or otherwise, the breasts [or buttocks] of I.C. under circumstances that can be reasonably construed as being for the purposes of sexual arousal or gratification; and that "(5) the Defendant acted purposely."  Id. at 981-82, 985.  The trial court defined certain terms in that instruction as follows:

> Sexual contact means the intentional touching either - - whether directly through clothing or otherwise, of the person or the actor's sexual or intimate parts. Sexual contact includes only that aforementioned contact which can reasonably construed as being for the purpose of sexual arousal or gratification.

> Purposely means the State must prove the Defendant's conscious object was to cause a result or engage in the conduct that comprises the element.

Id. at 981-82.

At the close of the State's case, defense counsel moved to dismiss the misdemeanor sexual assault charges concerning I.C. on the grounds that the evidence presented by the State at trial was insufficient to support convictions on those charges as to the element of I.C.'s age at the time of the offenses. Id. at 745-46. The trial court denied the motion. Id. at 746.

The state court record before this Court demonstrates that the following evidence was elicited at trial:

I.C. testified that while living at the Parker St. House, when she was thirteen and fourteen, and Waite would wrestle and roughhouse with her, Waite started to grab her inappropriately. Id. at 366. She testified that Waite hugged her from behind and "then he went under my shirt and grabbed my chest," then told I.C. not to tell her mother what he had done. Id. at 366-67. I.C. stated that after that incident, "[t]here was always physical contact of some sort," which she described as mostly "chest grabbing or patting [her] butt." Id. at 368. I.C. also stated that Waite would grope and slap her "on the butt." Id. at 395. I.C. testified that the "butt stuff would happen every other day, whenever he would walk by." Id. at 368. The jury found Waite guilty of two counts of misdemeanor sexual assault – one for touching I.C.'s breasts, and one for touching I.C.'s buttocks. Id. at 1008-13. The jury acquitted Waite of ten misdemeanor sexual assault charges concerning I.C. Id.

Considering the trial evidence in the light most favorable
to the State, the Court finds that, based on I.C.'s trial
testimony, a rational juror could find that each element of the
offense of misdemeanor sexual assault was satisfied on at least
one occasion as to the charge that Waite touched I.C.'s breasts
and at least one occasion as to the charge that Waite touched
I.C.'s buttocks.  Specifically, a rational juror could find that
Waite purposely had sexual contact with I.C. by touching her
breasts and buttocks when she was over thirteen and under
sixteen, that I.C. was not Waite's legal spouse, and that he did
so under the circumstances which could reasonably be construed
as being for the purpose of sexual arousal or gratification.
Accordingly, the District Judge should grant the respondent's
motion for summary judgment on Claim 5(b) as to Waite's claim
that the trial court erred in finding that there was sufficient
evidence of misdemeanor sexual assault on I.C. to go to the
jury.

### 4.    Attempted AFSA on I.C.

Waite was convicted of attempted AFSA on I.C., in violation
of RSA 632-A:2, I(a) and RSA 629:1.  The indictment charged as
follows:

> Richard Waite purposely attempted sexual penetration
> with a child (I.C. whose date of birth is 8/24/93)
> when Waite overcame the child through the actual

application of physical force, physical violence or
superior physical strength; to wit, while I.C. was a
member of the same household as Waite, he purposely
attempted to put his finger into the child's genital
opening --- Waite pinned the child against a wall,
pantry and/or refrigerator, then Waite stuck his hand
down the child's pants toward her vagina, a
substantial step toward Aggravated Felonious Sexual
Assault, under the circumstances as Waite believed
them to be, and he had the purpose to commit
Aggravated Felonious Sexual Assault --- Waite intended
to take advantage of the child's age at the time[.]

Crim. Case, Indictment No. 1013503C (Doc. No. 43-1, at 36).

At the close of the State's case, defense counsel moved to
dismiss that indictment on the grounds that the evidence
presented by the State at trial was insufficient to show that
Waite, when he put his hand in I.C.'s pants, had the purpose of
committing AFSA by sexual penetration, and thus that the trial
evidence could not support a conviction on that charge.  Id. at
749-50.  The trial court denied the motion.  Id., Trial Tr. 750.

As the trial court instructed the jury in Waite's case, the
elements of the offense of attempted AFSA, as that offense was
charged concerning I.C., are: "(1) [When I.C. was twelve to
sixteen years old], the Defendant had the purpose of engaging in
sexual penetration and thereby committing the crime of
aggravated felonious sexual assault"; "(2) [t]he Defendant took
a substantial step toward the commission of the crime of
aggravated felonious sexual assault by overcoming I.C. through
the actual application of physical force, physical violence,

superior physical strength, . . .”; and “(3) [t]he Defendant acted with the intent to take advantage of I.C.'s age at the time.”  Id. at 981.

The state court record before this Court demonstrates that the following evidence as elicited at trial:

I.C. testified that while she lived in the Parker St. House, Waite “would hide around corners while [she] walked.” Id. at 401.  On one of those occasions, she bumped into Waite and he pushed her against the pantry “with one of his hands and the rest of his body,” and that he put his other hand inside her pants.  Id. at 369.  I.C. testified that when he put his hand down her pants, his hand was outside of her underwear, and that she stopped him, pushed him off, and ran up to her room.  Id. at 369-70.

Upon review of the trial testimony, the Court finds that a rational trier of fact could believe I.C.’s testimony, and find that Waite committed the crime of attempted AFSA.  Specifically, the jury could find that, during the relevant time period, Waite pushed his hand into her pants toward her vagina while physically holding her against the pantry and preventing her from getting away.  A rational juror could conclude that, because I.C. had to stop Waite by pushing him, his action in putting his hand into her pants was an attempt to penetrate her vagina with his finger.  And, a reasonable jury could conclude

35

from I.C.'s testimony about that incident and Waite's other conduct toward I.C., that he did so with the intent to take advantage of I.C.'s age.

The Court finds that the evidence at trial that Waite committed the offense of attempted AFSA on I.C., viewed in the light most favorable to the state, was sufficient to allow the charge to go to the jury, and the trial court did not err by not dismissing the charge. The District Judge, therefore, should grant the respondent's motion for summary judgment as to Claim 5(b) to the extent it seeks judgment on Waite's claim that the trial court violated his Fourteenth Amendment due process rights by failing to dismiss the attempted AFSA charge concerning I.C. at the close of the State's case.

B.    Brady Violation (Claim 4(b))

In Claim 4(b), Waite alleges that the State violated his Fourteenth Amendment right to due process by failing to provide him with exculpatory evidence. Specifically, he alleges that the State failed to disclose information in discovery which provided the basis for the charge of attempted AFSA on I.C., a felony, in violation of Brady v. Maryland, 373 U.S. 83 (1963).

"In Brady, the Supreme Court held that 'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to

36

guilt or to punishment.'"  Martínez-Hernández, 118 F.4th at 88

n.23 (citation omitted); see also Giglio v. United States, 405

U.S. 150, 154 (1972) (applying disclosure obligation to

"information potentially useful in impeaching government

witnesses").

> To obtain a new trial based on the government's
> violation of its obligations under Brady, a defendant
> must show that "(1) the evidence at issue [is]
> favorable to the accused, either because it is
> exculpatory, or because it is impeaching; (2) that
> evidence [was] suppressed by the government either
> willfully or inadvertently; and (3) prejudice ...
> resulted."  To satisfy the prejudice element, "the
> defendant need demonstrate only a reasonable
> probability that, had the evidence been disclosed to
> the defense in a timely manner, the result of the
> proceeding would have been different." The "reasonable
> probability" standard does not require a showing that
> "the defendant would more likely than not have
> received a different verdict with the evidence."
> Rather, the question is whether "the likelihood of a
> different result is great enough to 'undermine[ ]
> confidence in the outcome of the trial.' "

Martínez-Hernández, 118 F.4th at 91-92 (internal citations

omitted); see also Conley v. United States, 415 F.3d 183, 193

(1st Cir. 2005) (describing the inquiry as whether, in the

absence of the withheld evidence, the defendant "received a fair

trial, understood as a trial resulting in a verdict worthy of

confidence").

Waite asserts that on September 15, 2014, Winchester Police

Department Sgt. Michael Tollett prepared a report which stated

"On 09-15-2014 I spoke to [Assistant Cheshire County] Atty. Gasaway.[8]  It was decided that based on [I.C.]'s interview a Gerstein affidavit was not needed.[9]  She did not disclose felony level charges.  The plan is to present our case for [I.C.] (Victim #2) at grand jury on September 29."  Doc. No. 50, at 39 (footnotes added).  The record does not reveal when the grand jury heard evidence concerning I.C., but on November 24, 2014, the grand jury returned an indictment charging Waite with attempted AFSA on I.C., a felony.

From Sgt. Tollett's statement in the September 15, 2014 police report, Waite concludes that there was information in the possession of the State, which was not provided to the defense, but was presented to the grand jury, in order for that body to return an indictment for attempted AFSA, a felony.  Other than that supposition, Waite has pointed to no evidence that such a statement or report exists.

---

[8] John Gasaway is one of the Assistant Cheshire County Attorneys who prosecuted Waite.

[9] "Under Gerstein v. Pugh, 420 U.S. 103 (1975), a person suspected of a crime whose liberty is restrained for more than the brief period of detention necessary to administratively process the arrest must be afforded a judicial determination of probable cause in a timely manner."  Giroux v. Town of Danbury, Civil No. 06-cv-250-PB, 2008 U.S. Dist. LEXIS 3130, at *21, 2008 WL 150655, at *7 (D.N.H. Jan. 15, 2008) (string citation omitted).  "A Gerstein affidavit is a sworn statement filed by the arresting officer to provide a proper basis for a judicial determination of probable cause."  Id.

In New Hampshire criminal prosecutions, as in federal criminal prosecutions, "the proceedings of the grand jury are secret." State v. Hall, 152 N.H. 374, 376, 877 A.2d 222, 225 (2005); see also In re Petition for Ord. Directing Release of Recs., 27 F.4th 84, 87 (1st Cir. 2022). Thus, there is nothing in the record before this Court, or, presumably, in the State court record, which sets forth what testimony or other evidence was presented to, or relied upon by, the grand jury deciding whether to issue an indictment. Waite's assertion that there must have been additional evidence presented to the grand jury, therefore, is entirely speculative.

Further, while a police officer or a prosecutor can hold an opinion as to whether a witness has disclosed facts sufficient to support a felony charge, it is the grand jury that ultimately determines whether there was probable cause to believe that a particular felony has been committed and should be charged. See Petition of State, 175 N.H. 371, 381-82, 288 A.3d 431, 441 (2022) ("'An indictment represents the conclusion of a grand jury that probable cause exists to believe that a defendant has committed a particular crime.'" (quoting Moody v. Cunningham, 127 N.H. 550, 554, 503 A.2d 819, 821 (1986))); see also United States v. Kaley, 571 U.S. 320, 328 (2014) ("The grand jury gets to say – without any review, oversight, or second-guessing –

whether probable cause exists to think that a person committed a crime.").

If there was a statement or report in the state's possession memorializing an additional or different statement by I.C., that was not provided to Waite, accusing Waite of more serious criminal acts than her previous statements, that statement would be exculpatory impeachment evidence, as it could be used to impeach her credibility with her prior inconsistent statements.  However, even if Waite could demonstrate such a statement existed, he cannot demonstrate prejudice from the State's failure to disclose or provide it to the defense.  I.C. testified at trial to Waite's felonious conduct.  If I.C.'s testimony was different than her previous statements, impeachment with her prior inconsistent statements was available to the defense anyway.

For these reasons, Waite cannot demonstrate that his Fourteenth Amendment due process rights, or rights under <u>Brady</u>, were violated.  Accordingly, the District Judge should grant the respondent's motion for summary judgment with respect to Claim 4(b).


C.   <u>Erroneous Evidentiary Ruling (Claim 5(a))</u>

In Claim 5(a), Waite alleges that the trial court violated his Fourteenth Amendment right to due process right by limiting

the testimony of his mother, Donna Vollert.  "[O]rdinarily,
issues concerning the admission of evidence, scope of cross
examination, or the like present solely state law questions
(which are not matters proper for a § 2254 petition) and are not
of constitutional dimension."  Moran v. Vose, 816 F.2d 35, 36
(1st Cir. 1987) (per curiam); see also Palmariello v. Supt. of
Mass. Corr. Inst.-Norfolk, 873 F.2d 491, 494 (1st Cir. 1989)
("Habeas review does not ordinarily encompass garden-variety
evidentiary rulings.").

> An erroneous evidentiary ruling that results in a
> fundamentally unfair trial in state court may violate
> the Due Process Clause of the Fourteenth Amendment and
> merit a federal writ of habeas corpus.  Such relief is
> elusive, as the Supreme Court has "defined the
> category of infractions that violate 'fundamental
> fairness' very narrowly."  Dowling v. United States,
> 493 U.S. 342, 352 (1990).  To warrant habeas relief,
> the state court's application of state law must be so
> arbitrary or capricious as to constitute an
> independent due process . . . violation.  That is, for
> there to be a constitutional violation, [the] state
> evidentiary error must so infuse the trial with
> inflammatory prejudice that it renders a fair trial
> impossible.

Gomes v. Silva, 958 F.3d 12, 23-24 (1st Cir. 2020) (certain
punctuation, internal quotation marks, and citations omitted).
In other words, "[u]nless an evidentiary ruling is 'so
fundamentally unfair as to deny due process,' it is a matter of
state law."  Ericson v. Landry, No. 2:14-CV-315-GZS, 2014 U.S.

Dist. LEXIS 179093, at *16, 2015 WL 2251494, at *6 (D. Me. Dec. 31, 2014), R&R approved, 2015 U.S. Dist. LEXIS 62490, at *2, 2015 WL 2251494, at *1 (D. Me. May 13, 2015) (quoting Palmariello, 873 F.2d at 494).

Prior to Vollert's testimony at trial, the State objected to her "potentially offering an opinion" which the State claimed would be akin to "an expert opinion about the way M.C. presented, whether she appeared to be a victim of abuse or neglect." Crim. Case, Trial Tr. 796. The State further objected to Vollert testifying that she herself had been abused as a child. Id.

Defense counsel agreed that any sort of expert opinion testimony from Vollert would be inappropriate, and stated that he "didn't intend to inquire as to whether she has an opinion as to whether [M.C.] had been a subject of abuse." Id. at 796-97. Defense counsel did argue, however, that testimony that Vollert had been a victim of abuse was "important" because it "gives her a particular sensitivity to the issue" and could "demonstrate why [Vollert] was particularly mindful or would be particularly mindful if there was something going on." Id. at 797. Defense counsel further argued that Vollert's own victimhood "goes to a reason why she would not necessarily testify for her son in a favorable manner," and that it could "rebut any presumption that

she somehow particularly [sic] biased towards her son and not
being truthful." Id.

The trial court ruled that Vollert could offer testimony
about her personal observations of M.C. and I.C., but could not
"characterize or offer opinions about" her observations,
stating,

> [w]ith regards to the fact that she may have been
> abused and she was sensitized to these issues, I'm
> going to find that that's not admissible, . . . I
> think that that's sort of an indirect way to try to
> have her offer opinion testimony, what would be expert
> opinion testimony.  And its substantially more
> prejudicial [to the State] than probative under [New
> Hampshire Rule of Evidence] 403.

Id. at 798.

At trial, Vollert testified was that she moved into the
Parker St. House about six months after Waite, Panos, M.C., and
I.C. moved there, and lived there until 2011.  Id. at 808, 810.
Regarding M.C. and I.C., Vollert testified that she came to know
them very well, and that she "thought of them as [her]
granddaughters," and "treated them as such."  Id. at 801.  She
stated she had more contact with M.C. than with I.C.  Id. at
811.

As to M.C., Vollert testified as follows:

> The times that I knew [M.C.], she was very vibrant and
> very active. She was active in a lot of different
> sports. She lived high drama. She was always on the go
> and very happy and laughing and just a happy teenager,
> if you will. . . . [M.C.] never seemed depressed or
> unhappy.

Id. at 811-12.

> [M.C.] would get upset very easily.  She was very
> dramatic about things.  And when things did not go her
> way, she just went into this drama poise of everybody,
> you know, didn't understand her or whatever.  But
> very, very dramatic.  I used to call her the drama
> queen.  . . .

Id. at 869.

Vollert also testified that when she saw M.C. and Waite interact, "it was just a normal interaction," and that when she saw I.C. and Waite interact, she noticed "nothing out of the ordinary."  Id. at 812, 816.  Vollert also testified that when M.C. stayed at the Hinsdale House so she could continue at Keene High School, that M.C. was given the choice of sleeping on a couch downstairs or in Waite's room, on the top bunk of Waite's bunkbed, and that she chose to sleep on the top bunk in Waite's room.  Id. at 816.

Upon review of the record in this case, the Court finds that the evidence which the trial court excluded, that Vollert had been abused as a child, does not appear to be particularly relevant to whether Waite committed the sexual assaults on M.C. and I.C. of which he was convicted.  Vollert was not an expert witness, and neither the defense nor the State intended to ask her to opine, based on her perceptions of M.C. and I.C. and her own experience, as to whether Waite had sexually abused M.C. and I.C.  To the extent the defense sought testimony from Vollert

that M.C. was a normal and happy teenager, in order to create
doubt as to whether M.C.'s mood was consistent with being a
victim of sexual assault, that evidence was before the jury, and
was the jury's to evaluate.

The defense also argued that Vollert's testimony about her
own history of childhood abuse would serve to rebut the
assumption the jury might make that Vollert was biased in her
son's favor, or might provide false testimony to assist her son.
When asked on cross-examination whether she would want anything
bad to happen to her son, Vollert responded:

> As a mother, no. But as a human being, I have to say
> as my son I love him very much, but it's up to the
> Court to decide what his fate is going to be. I have
> not expressed any interest one way or the other on
> that. I will stand by my son for as long as I can. But
> what happens, what happens. And I'll still support
> him.

Id.  Vollert also testified as follows.

> I would support [Waite] no matter what happened, like
> whatever any mother would do for her son, but that I
> was not – I was being impartial about everything that
> was going on because I don't know all the facts that's
> on there, and I'm not one that's going to jump to a
> conclusion of whatever happens.  I listen to the
> evidence, whatever's going on, and it's not my job to
> decide who's guilty or innocent.  That's the jury.
> But as a mother, I would always support him, whatever
> happened.

Id. at 894.  Therefore, Vollert did not testify in a manner
that showed overwhelming bias in Waite's favor such that

45

her testimony that she was abused as a child was necessary to counter that bias.

Vollert was not a direct witness to any of the crimes of which Waite was convicted. She testified as to her observations of and feelings about M.C., I.C., and Waite, but did not testify to facts which bore directly on the events giving rise to the criminal charges. It is unlikely, therefore, that the jury's verdicts were based on Vollert's testimony, or would have been different had she testified that she was abused as a child.

Even if the Court were to find that the trial court's decision was erroneous, the exclusion of testimony here did not "so infuse the trial with inflammatory prejudice that it render[ed] a fair trial impossible." Gomes, 958 F.3d at 23–24. The trial court's evidentiary ruling was not "so fundamentally unfair as to deny due process," and thus was a matter of state law not cognizable in a § 2254 petition. Palmariello, 873 F.2d at 494; see also Moran, 816 F.2d at 36. The District judge, therefore, should grant the respondent's motion for summary judgment as to Claim 5(a).

## Conclusion

For the foregoing reasons, the District Judge should deny Waite's motion for summary judgment (Doc. No. 31), without prejudice to his ability to assert the arguments therein at a

later stage of this case.  Further, the District Judge should grant the respondent's motion for summary judgment (Doc. No. 49) to the extent it seeks judgment on Claims 4(a), 4(b), 5(a), and 5(b), and otherwise deny that motion, without prejudice to the respondent's ability to assert the arguments therein at a later stage of the case.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  The fourteen-day period may be extended upon motion.  Only those issues raised in the objection to this Report and Recommendation are subject to review in the district court.  See Sch. Union No. 37 v. United Natl Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010).  Any issues not preserved by such objection(s) are precluded on appeal.  See id.  Failure to file any objections within the specified time waives the right to appeal the district court's order.  See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).


_____
Andrea K. Johnstone
United States Magistrate Judge

February 28, 2025

cc: Richard A. Waite, pro se
    Elizabeth C. Woodcock, Esq.